# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | Case No. 25-34901 (JPN) |
| TIMOTHY JOHN "TJ" CAREY, | § | |
| | § | CHAPTER 11 |
| DEBTOR | § | |

## DEBTOR-IN-POSSESSION'S
## PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

Timothy John "TJ" Carey, Debtor-in-Possession, (the "Debtor") files the Debtor-in-Possession's Plan of Reorganization and Disclosure Statement. Timothy John "TJ" Carey, as Debtor-in-Possession, is seeking to repay his debts pursuant to the terms of his Plan of Reorganization (hereinafter, the "Plan"). As required by Title 11 of the United States Code (the "Bankruptcy Code," or the "Code") the Plan classifies claims and interests in various classes according to their right of priority of payments as provided in the Bankruptcy Code. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive under the Plan.

The Debtor filed his voluntary petition pursuant to Chapter 11 of the Bankruptcy Code on August 24, 2025 (the "Petition Date").

The Court has not yet approved the Disclosure Statement or confirmed the Plan, and thus the terms of the Plan are not yet binding on anyone. If the Court later confirms the Plan, then the Plan will be binding on the Debtor and on all creditors and interest holders in this case.

The Debtor represents that everything in this document is true to the best of his knowledge.

## READ THIS DOCUMENT CAREFULLY IF YOU WANT TO KNOW:

- Who can vote or object to the Plan.
- The treatment of your claim (*i.e.,* what your claim may receive if the Plan is confirmed).
- The history of the Debtor and significant events during his bankruptcy case.
- How the Court will decide whether to confirm the Plan.
- The effect of the Plan's confirmation.
- Whether the Plan is feasible.

## I.  INTRODUCTION

### A.  The Plan Proponent

1. The Plan is proposed by Timothy John "TJ" Carey, Debtor-in-Possession.

Where appropriate, references to the Debtor, Timothy John "TJ" Carey, and

Debtor-in-Possession shall also mean the Reorganized Debtor.

**B.      Source of Information Contained Herein.**

2.      Unless otherwise indicated, the Debtor has submitted all of the information contained in this Plan of Reorganization and Disclosure Statement.   The source of information is the Debtor, his books and records, and the books and records of the Debtor's businesses, namely T & L Carey Enterprise, LLC d/b/a Milstead Glass ("Milstead Glass"), and T.J. Carey Interests, LLC ("TJ Interests").

3.      The source and information concerning assets are from the Debtor's schedules, as amended, supplemented, or otherwise modified with current information available to the Debtor.

**C.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.**

4.      The Court has not yet confirmed the Plan described in this Plan of Reorganization and Disclosure Statement.  This section describes the general procedures pursuant to which the Plan will or will not be confirmed.

5.      The Court will conduct a hearing to determine whether to approve this Disclosure Statement and ultimately, whether to confirm the Plan.  These hearings may be held separately or may be combined by the Court.  Any such hearings will take place at the United States Courthouse, 515 Rusk, Houston, Texas 77002, Courtroom No. 403, 4th Floor, before the Honorable United States Bankruptcy Jeffrey P. Norman.  You will receive a separate notice when these hearings will occur.

**IF THE HEARING IS CONDUCTED IN THE COURTROOM AND/OR BY AUDIO AND VIDEO CONNECTION, AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.  YOU MAY ACCESS THE FACILITY AT (832) 917-1510.  ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE NORMAN'S CONFERENCE ROOM NUMBER IS "174086".**

**VIDEO CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE NORMAN'S HOMEPAGE. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

6.     If you are entitled to vote to accept or reject the Plan, you will be sent a ballot.  You must vote on the ballot and return the ballot that will be sent to you by the deadline or it will not be counted.  You will receive a separate notice setting forth the deadline to cast your vote.

7.     Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Debtor, Debtor's attorney, creditors, parties in interest, parties requesting notice, and the United States Trustee.  You will receive a separate notice setting forth the deadlines for filing these objections.

8.     If you want additional information about the Plan, you should contact the attorney for the Debtor, Bennett G. Fisher, as set forth at the end of this document.

## II.     INFORMATION REGARDING THE DEBTOR

### A.     A Brief History of the Debtor and the Events Leading to the Chapter 11 Case

9.     The Debtor is an individual, and the Plan is to be funded through the Debtor's earned income from his businesses.

10.     As of the Petition Date, the Debtor held interests in two entities, namely Milstead Glass and TJ Interests.  Milstead Glass is a company owned 50% by the Debtor and 50% by the Debtor's estranged wife, Linda Carey.  TJ Interests is a real estate holding company in which the Debtor holds an 89% interest (the Debtor's father holds the other 11%).

11.     The Debtor and Linda Carey are engaged in difficult divorce proceedings,[1] although the couple did, in fact, enter into a *Mediated Settlement Agreement on Temporary Orders as to All Issues* dated December 4, 2024 (the "MSA").  Unfortunately, the MSA is unworkable for the Debtor and the payments imposed by the MSA caused the Debtor to fall behind in his obligations to creditors, which led to this bankruptcy case.

12.     Pursuant to the MSA, Linda Carey agreed to provide the Debtor with exclusive use over:

> [T]he operation and management of T&L Carey Enterprises d/b/a Milstead Glass and exclusive use of the property where the business [Milstead Glass] is located as well as the bank accounts and credit cards of the business.  Wife [Linda] is enjoined from using these accounts.

MSA ¶ 1.1.h.

13.     The MSA also governed the sale of the Debtor and Linda Carey's shared marital residence located at 159 Del Monte Pines Dr., Montgomery, Texas 77316. The home was sold in spring 2025 and the proceeds of that sale, approximately $500,000, are held in an account with The Vanguard Group, Inc., controlled by Linda Carey. Linda Carey was instructed by the U.S. Trustee to move these funds to two approved FDIC-guaranteed accounts and it is unknown whether Linda Carey respected the instructions of the U.S. Trustee's attorney.

## III.     EVENTS IN THE DEBTOR'S BANKRUPTCY CASE

### A.     Background of Debtor's Case

14.     The Debtor filed his voluntary petition pursuant to Chapter 11 of the Bankruptcy Code on August 24, 2025.  The filing of the petition initiated an order for

---

[1] The Debtor's divorce case is pending in the County Court at Law No. 3 of Montgomery County, Texas as Case No. 25-01-01188.

bankruptcy relief under Section 301 of the Bankruptcy Code.  Upon the filing of the case, the automatic stay was imposed pursuant to Section 362(a) of the Bankruptcy Code. The automatic stay prohibits most collection efforts against the Debtor and his property.

15.     As stated above, the Debtor is party to an ongoing divorce proceeding with his estranged wife, Linda Carey.

16.     When the Debtor filed this bankruptcy case, all of his property became property of the bankruptcy estate, including any community property in the possession of Linda Carey.

17.     There are no other bankruptcy cases related to this bankruptcy case.[2] An Unsecured Creditors Committee has not been formed.

18.     The first date scheduled for the meeting of creditors under Section 341(a) of the Bankruptcy Code was September 16, 2025.  The creditors' meeting took place as scheduled, and was continued and concluded on October 28, 2025.

19.     The deadline for non-governmental creditors to file claims was December 15, 2025.  The deadline for governmental creditors to file a claim is February 23, 2026.

**B.     Employment of Professionals**

20.     The Debtor has employed Bennett G. Fisher and Lewis Brisbois Bisgaard & Smith, LLP ("Lewis Brisbois") as his attorneys in this case.  The Debtor's father paid an initial retainer of $50,000.00 to Lewis Brisbois before the case was filed. Lewis Brisbois filed a retention application for employment by the Debtor, which has been

---

[2] A case was previously filed for the Debtor, but this case was dismissed due to a technicality involving the date the Debtor's credit counseling certificate was issued.

approved.

21.     The Debtor is maintaining the books and accounting records of TJ Interest, Milstead Glass, and for himself personally.  The Debtor, together with his counsel, have sufficient skill to perform the bookkeeping and accounting reports required of the Debtor.

## C.     Description of Assets

22.     The Debtor filed schedules of all of his assets.  Complete copies of the schedules are available from the Clerk of the Court.  The primary assets of the bankruptcy estate, their estimated values and associated liens, without deduction for any disputed claim amounts, are:

| Description of Asset | Estimated Fair Market Value | Amount of Debt Secured by Liens Against this Asset | Basis of Estimate of Value |
|---|---|---|---|
| T & L Carey Enterprise, LLC d/b/a Milstead Glass | $815,000 | Approx. $815,000[3] | Estimated value of business less liabilities |
| T.J. Carey Interests, LLC | $89,000 | Approx. $89,000[4] | Estimated value of business less liabilities |
| 2021 GMC Yukon | $43,588 | $5,283 | Kelley Blue Book Value less liens |
| Cash and Financial Deposits | $498,959 | N/A | Actual balances as of the Petition Date (adjusted by latest Monthly Operating Report) |

---

[3] The total amount of the debt is approximately $2,200,000, this amount is reduced to reflect the amount that is secured by the value of the underlying asset.  The remainder is undersecured.

[4] The total amount of the debt is approximately $2,500,000, this amount is reduced to reflect the amount that is secured by the value of the underlying asset.  The remainder is undersecured.

| Description of Asset | Estimated Fair Market Value | Amount of Debt Secured by Liens Against this Asset | Basis of Estimate of Value |
|---|---|---|---|
| **TOTALS** | $1,459,888 | Approx. $904,000 | |

23.     T & L Carey Enterprise, LLC d/b/a Milstead Glass.  Milstead Glass is a company owned 50% by the Debtor and 50% by the Debtor's estranged wife, Linda Carey. Milstead Glass serves residential and commercial customers in the Houston area as a glass installer.  The Debtor receives a salary from Milstead Glass, paid weekly, in the approximate amount of $1,700 per week, or $88,000 a year.  Pursuant to the MSA, this salary is paid directly to Linda Carey.

24.     T.J. Carey Interests, LLC:  The Debtor holds an 89% interest in TJ Interests, a real estate holding company that owns a single commercial property and four residential properties which are leased and produce rental income.  TJ Interests also owns a parcel of vacant land and two residential properties that require significant repairs before they may be leased to tenants.  The Debtor's estimated net monthly income from TJ Interests (after mortgage payments) is approximately $5,250 per month.

25.     Cash and Financial Deposits.  As of the Petition Date, the Debtor possessed approximately $500,000 in cash and financial deposits, consisting of $486,908 in possession of the Debtor's estranged spouse, Linda Carey, $12,500 in cash or other equivalents, $1,656 held at Simmons Bank, $424 with Wells Fargo checking and $505 in Wells Fargo Brokerage, $6,568 with E-Trade, $3,649 with Robinhood, and $90 with USAA (total: $499,800).  As of the last monthly operating report, the Debtor's cash balance is approximately $12,051.  Combined with the amounts in Linda Carey's possession, the total is approximately $498,959.

26.     In addition to these assets, M. Timothy Carey, the father of the Debtor, has agreed to contribute $500,000 in cash and credit to help fund this Plan.

**D.     Claim Summary**

27.     The Debtor's bankruptcy schedules reflect the claims against it and their respective priorities.   As of the Petition Date, the Debtor has scheduled a total of $4,758,260 in unsecured claims, with the largest creditors being Simmons Bank and the Debtor's father, M. Timothy Carey.  Linda Carey has filed a proof of claim in the amount of $2,209,494.02 (Claim No. 6), but the Debtor contests the amount of this claim, and reserves the right to dispute the claim through the filing of a claim objection.[5]

28.     If the Debtor has classified a claim on his bankruptcy schedules as disputed, unliquidated, or contingent, then the creditor must file a proof of claim.  If the Debtor classified a claim on Schedule F as disputed, unliquidated, or contingent, and if the creditor has not filed a proof of claim by the applicable bar date, then the Debtor will not pay any amount towards that claim.

29.     Copies of Schedules D (secured creditors) and E/F (priority and general unsecured creditors) are available from the Clerk of the Court or from the Debtor's counsel.

**E.     Present Condition and Post-Petition Operations of the Debtor**

30.     Since filing the bankruptcy case, the Debtor has maintained the real property held by TJ Interests in its current condition.  Such real property is properly insured for hazard and flood risks, and all non-leased real property is secured from trespassers. Leased real property is protected from trespassers by existing tenants.

---

[5] The Debtor and his wife (Linda Carey) have agreed to mediate this matter before Hon. Marvin Isgur, the date of such mediation is pending.

31.     Currently, the Debtor has two sources of revenues; first, the Debtor's salary from Milstead Glass (the business wholly owned by the Debtor together with his estranged wife Linda Carey), which is currently paid directly to Linda Carey pursuant to the MSA; and second, the Debtor receives some income from TJ Interests, specifically, the rental income less the operating expenses.

**F.      Anticipated Litigation**

32.     The Debtor is aware of a potential cause of action arising under the provisions of the Bankruptcy Code relating to fraudulent transfers and preference actions involving the Debtor's wife, Linda Carey.   In violation of the MSA, Linda Carey wrongfully withdrew $33,355 from Milstead Glass over three transactions for her own use within the 90 days prior to the Petition Date (*i.e.*, $4,283 on June 25, 2025, $4,072 on July 3, 2025, and $25,000 on August 15, 2025).   In addition, Linda Carey withdrew an additional $4,164 from Milstead Glass on May 16, 2025, which is greater than 90 days prior to the Petition Date but within 1 year prior to the Petition Date; Linda Carey is an insider to the Debtor, so these funds may also be recoverable as a preference.

33.     The Debtor also anticipates potential litigation from Linda Carey relating to the Debtor's ongoing divorce proceedings, including but not limited to a motion to dismiss the instant bankruptcy case, which has been filed by Linda Carey, but not yet heard. Linda Carey also filed a motion to lift the stay to prosecute the divorce proceedings between the Debtor and herself, which was denied in part and granted in part by the Court. There is also a pending motion to dismiss filed by the United States Trustee relating to the filing of monthly operating reports, but the Debtor is confident that a consensual resolution to this motion can be reached.

## IV.     PLAN OF REORGANIZATION

### A.     The Purpose of the Plan of Reorganization

The purpose of the Plan of Reorganization (the "Plan") is to provide a resolution of the Debtor's present financial distress so that all classes of claims can ascertain how and when their claims will be satisfied.  The Plan is comprehensive so that all holders of claims can ascertain how and when their claims will be treated relative to other claims.  Therefore, the Plan identifies the holders of claims against the Debtor, provides for the proper treatment of these claims, and implements an orderly procedure to satisfy those claims.

As required by the Code, the Plan places claims in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims is impaired or unimpaired.  If the Plan is confirmed, the amount of your recovery will be limited to the amount provided by the Plan and to the method and schedule provided by the Plan.

### B.     Substance of Plan & Source of Funding

The Plan will be funded through the Debtor's ongoing employment and income from Milstead Glass and TJ Interests.  The funds will be distributed in accordance with this Plan and the Bankruptcy Code payment distribution schema set forth in, *inter alia*, section 1129 of the Code.

In addition to these funding sources, M. Timothy Carey, the father of the Debtor, has agreed to contribute $500,000 in cash and credit to help fund this Plan.

The initial payment will be $400,000 together with a line of credit of $100,000.  The Debtor will then invest this amount into Milstead Glass in exchange for additional equity.  As consideration for the loan, M. Timothy Carey will receive a promissory note together with a second lien security interest in the Debtor's equity in Milstead Glass.[6]

### C.     Effective Date of the Plan

The Effective Date of this Plan is the first day following fourteen (14) days after the date of the entry of the final order confirming the Plan.  But, if a stay of the confirmation order is in effect on that date, the Effective Date will be the first day of the month following that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

### D.     Classifications of Claims and Interests

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, claims and interests must be designated into classes.  Generally, these classes include secured claims, priority claims, general unsecured (non-priority) claims, the unsecured claims of insiders, and the claims of interest holders (of which there are none, as the Debtor is an individual).  Classes of

---

[6] Simmons Bank has a first lien security interest on the Debtor's equity in Milstead Glass.

claims may include more than one creditor or claimholder if the claims are substantially similar to the other claims in that class.

Chase Bank's secured claim against the Debtor's 2021 GMC Yukon is separately classified to the extent of the value of the collateral. The 2021 GMC Yukon is owned by the Debtor (who is the primary obligor on the indebtedness owed to Chase Bank), but the vehicle currently in possession of Linda in accordance with the MSA. All general non-insider unsecured claims are classified together as a separate class, and include the claims of Simmons Bank. The Debtor is a guarantor of that debt. The priority unsecured claim of Linda Carey is separately classified, and the general unsecured claims of insiders are also separately classified.

Thus, in the Plan, there is one class of secured claims, and three classes of unsecured claims, comprised of a class of priority unsecured claims, a class of general unsecured claims, and a class of insider unsecured claims. .

### E.      Impaired and Unimpaired Claims and Interests

Pursuant to Section 1126(f) of the Bankruptcy Code, classes that are not impaired by a plan are conclusively presumed to have accepted that plan. An unimpaired claim is defined by Section 1124 of the Bankruptcy Code. Generally, a claim is unimpaired if the plan leaves unaltered the legal, equitable and contractual rights of such claim or, if the holder is entitled to accelerated payment after the occurrence of a default, the plan cures, reinstates and compensates the holder and the debtor performs non-monetary obligations.

Likewise, a claim is impaired if the plan alters the legal, equitable or contractual rights of the holders of such claim.

The Debtor's treatment of each class indicates whether the class of claims is impaired or unimpaired.

### F.      Treatment of Claims

Claims shall be treated as follows under this Plan:

| |
|---|
| **Class 1 Claim Holder:** Secured Claim of Chase Bank (Against 2021 GMC Yukon) (Amount: $5,283) |
| **Impairment:** This Class is Not Impaired. |
| **Treatment:** The Claim is secured by the Debtor's interest in that certain 2021 GMC Yukon, Chase account number ending in 0205. |
| The Claim Holder shall retain its lien on the 2021 GMC Yukon. |

| |
|---|
| **Class 2 Claim Holders:** Allowed Priority Unsecured Claims of Insider Linda Carey |
| **Impairment:** This Class is Impaired. |
| **Treatment:** The Claimant of this class will receive the Debtor's interest in all cash and cash-equivalent deposits in possession of the estate (excluding funds provided by |

M. Timothy Carey), in satisfaction of the holder's property equalization claim. No alimony or spousal support shall be owed under the MSA, which shall be rejected. Child support shall remain due and owing.

| **Class 3 Claim Holders:** Allowed General Unsecured Claims |
|---|
| **Impairment:** This Class is Impaired. |
| **Treatment:** The Class 3 claimants shall be paid quarterly on a *pro rata* basis from the Debtor's business income.  The Debtor shall set aside the amount of $5,416 each month for plan payments to holders of Class 3 claims, based on the projected disposable income of the Debtor over the next five years |

## G.    Unclassified Claims

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, certain types of claims are not classified.  They are automatically entitled to specific treatment under the Bankruptcy Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Debtor has not placed the following claims in any class:

### 1.    Administrative Expenses

Administrative expenses are the costs and expenses of administering the Debtor's chapter 11 case, which are allowed under 507(a)(2) of the Code.  The Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

One administrative expense is the payment of the quarterly fees to the United States Trustee.  The Debtor is required to pay these funds for each quarter that the Debtor's case is open.  The Debtor filed his case in the third quarter of 2025.  This obligation will continue each quarter until the Debtor's case is closed.

Another administrative expense is the payment of professionals employed by the Debtor.  In this case, the professionals employed by the Debtor are the Debtor's attorneys, Bennett G. Fisher and others at Lewis Brisbois Bisgaard & Smith, LLP.  The attorneys' fees are incurred at the rate $550.00 per hour for partners and $350 per hour for associates and $150 per hour for paralegals.  It is estimated that the total attorneys' fees in this case will approximate $75,000.

The Debtor's father previously paid a retainer of $50,000.  The Debtor has agreed that the balance of the allowed fee will be paid on the Effective Date of the Plan.  The final allowance of these fees will be determined by the Court after a notice and opportunity for the holders of claims and interests to object to the amount of the attorneys' fees.

### 2.    Priority Tax Claims

Priority tax claims are secured property taxes described by Section 507(a)(8) of the Bankruptcy Code.  Unless the holder of such a Section 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief, paid from cash of the estate.

*3.        Treatment of Unclassified Claims*

| Unclassified Claim Holder | Estimated Amount Owed | Treatment |
|---|---|---|
| United States Trustee | $250.00 for 3rd Quarter 2025 | The Debtor will pay the pre-confirmation fees owed to the U.S. Trustee on or before the Effective Date of the Plan.  After confirmation, the reorganized Debtor will file with the Court and serve on the U.S. Trustee quarterly financial reports in a format prescribed by the U.S. Trustee, and the Debtor will pay post-confirmation quarterly fees to the U.S. Trustee until a final decree is entered or the case is converted or dismissed.  28 U.S.C. Section 1930(a)(6). |
| Lewis Brisbois | $75,000 | The Debtor will pay the allowed claim the later of the Effective Date or 14 days after the Court approves the final fee application of Debtor's counsel. |

## H.        Executory Contracts and Unexpired Leases

A plan may provide for the assumption or rejection of all executory contracts and leases.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.  A plan may also list how a Debtor will cure and compensate the other party to such contract or lease for any such defaults.

At this time, the only executory contract to which the Debtor is a party is the MSA. The Debtor intends to reject the MSA.

## I.        MISCELLANEOUS PLAN PROVISIONS

*1.        Payment of Disputed Claims*

A disputed claim is a claim that has not been allowed or disallowed by a final order, or as to which either (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor scheduled such claim as disputed, contingent, or unliquidated.

Except as provided for Class 3 claims, no distribution shall be made on account of a disputed claim unless such claim is allowed by a final order.  The Debtor will have the

power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

The Debtor reserves the right to pay Class 3 claims under protest and thereafter seek to recover from the applicable creditor(s) any part of such Class 3 claimant's or claimants' disallowed claim(s).

### 2.    Setoff and Other Rights

In the event that the Reorganized Debtor has claims of any nature whatsoever against the holder of a claim, the Reorganized Debtor may, but is not required to, setoff against the claim (and any payments or other distributions to be made in respect of such claim hereunder), subject to the provisions of Section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any claim under the Plan shall constitute a waiver or release by the Reorganized Debtor of any claim that the Reorganized Debtor has against the holder of a claim.  It is the Reorganized Debtor's position that a holder of a claim who owes the Reorganized Debtor should not be entitled to setoff from the amount owed by the Reorganized Debtor if such balance is necessary for the Debtor's successful reorganization.

### 3.    Post-Effective Date Fees and Expenses of Professional Persons

The Reorganized Debtor shall, in the ordinary course of business and without the necessity for any notice, motion, fee application, or approval by the Court, pay the reasonable fees and expenses arising from and after the Effective Date of the professional persons employed by the Reorganized Debtor.

### 4.    Bankruptcy Restrictions

From and after the Effective Date, the Reorganized Debtor shall no longer be subject to the restrictions and controls provided by the Code (e.g., Sections 363, 364) or Bankruptcy Rules (except with respect to claim objections and avoidance or recovery of estate actions under bankruptcy law), the Court, or the United States Trustee's guidelines (however, the Reorganized Debtor shall provide the United States Trustee such reports as are required until the entry of a final decree).  The Reorganized Debtor may compromise claims and controversies arising from and after the Effective Date without the need of notice to, or approval by, the Court.  From and after the Effective Date, the Reorganized Debtor may conduct his affairs without the need of seeking Court approval with regard to any aspect of the Reorganized Debtor's affairs, except that the Reorganized Debtor shall comply with all terms of this Plan.

### 5.    Modification of the Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

Upon request of the Debtor, the United States Trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

A holder of a claim or interest that had accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan, as modified, unless, within the time fixed by the Court, such holder changes its previous acceptance or rejection.

### 6.    Revocation of the Plan

The Debtor reserves the right to revoke and/or withdraw the Plan prior to entry of the order of Confirmation.  If the Debtor revokes and/or withdraws the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void, and nothing contained herein shall be deemed (a) to constitute a waiver or release of any claims by the Debtor or any other person, (b) to prejudice in any manner the rights of the Debtor or any other person, or (c) to constitute an admission by the Debtor or any other person.

### 7.    Events of Default

Any act or omission by the Reorganized Debtor in contravention of a provision within the Plan shall be deemed an Event of Default under the Plan.  If a holder of an Allowed Claim asserts an Event of Default under the Plan has occurred, such person must provide the Reorganized Debtor and his counsel with written notice of such default and a reasonable opportunity to cure.  If the Event of Default asserted in the notice remains uncured on the 30th day from the date on which such notice is mailed to the Reorganized Debtor and his counsel, the holder of such Allowed Claim may pursue any rights or remedies it may have under the Plan or applicable non-bankruptcy law, whether state, federal, or otherwise.

Any act or omission by a creditor in contravention of a provision within the Plan shall be deemed an Event of Default under the Plan.  Upon an Event of Default that remains uncured after notice and opportunity to cure, sufficient under the circumstances, the Reorganized Debtor may seek to hold the defaulting party in contempt of the confirmation order.  If such creditor is found to be in default under the Plan, then that party may be required to pay the reasonable attorneys' fees and costs of the Reorganized Debtor in pursuing such matter.  Furthermore, upon the finding of such a default by a creditor, the Court may (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Rule 70 of the Federal Rules

of Civil Procedure, or (b) issue and enter such other order as may be equitable which does not materially alter the terms of the Plan as confirmed.

A Notice of an Event of Default of a provision within the Plan shall be properly addressed and mailed to the Reorganized Debtor by first class mail, postage prepaid, and by certified mail, return receipt requested, as follows.

Bennett G. Fisher
Lewis Brisbois Bisgaard & Smith
2400 Greenway Plaza, Suite 1400
Houston, TX 77046

## J.      MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.      *The Reorganized Debtor*

On the Effective Date of the Plan, the Debtor will become the Reorganized Debtor. The management and control of the Reorganized Debtor will remain with T.J. Carey.

### 2.      *Vesting of Property*

On the Effective Date of the Plan, all property of the estate of the Debtor, including but not limited to all estate actions, shall vest in the Reorganized Debtor. Except as expressly provided in the Plan, all assets of the Debtor shall vest free and clear of all claims, interests and liens or successor liability claims of the Debtor, which shall be owned and controlled as set forth in the Plan. The Debtor shall retain 100% interest in Milstead Glass following the Effective Date of the Plan.

### 3.      *Source of Funding for the Plan and Disbursement of Funds*

The source of funding in the Plan for the payment of all claims shall be the future business and employment income of the Debtor as well as the current cash deposits of the Debtor, and the $500,000 cash and credit contribution of M. Timothy Carey to the Debtor in support of this Plan.

The Reorganized Debtor shall collect these funds and pay the obligations under the confirmed Plan as they become due.

### 4.      *Powers and Duties of the Reorganized Debtor with Respect to Consummation of the Plan*

The Reorganized Debtor is empowered to: (a) take all steps and execute all instruments and documents necessary to effectuate the Plan; (b) make distributions and payments contemplated by the Plan; (c) comply with the Plan and the obligations thereunder; (d) employ, retain or replace professional persons to represent the Reorganized Debtor with respect to his responsibilities; (e) object to claims; (f) prosecute any estate actions; and (g) exercise such other powers as may be vested in the Reorganized Debtor pursuant to order of the Court or pursuant to the Plan or as the Reorganized Debtor deems to be necessary and proper to carry out the provisions of the Plan. The Reorganized Debtor

shall have the duty of carrying out the provisions of the Plan, which shall include taking or not taking any action that the Reorganized Debtor deems to be in furtherance of the Plan.

### 5.    Assumption of Liabilities

The liability for and obligations under the Plan shall be assumed by and become obligations of the Reorganized Debtor.

### 6.    Retention of Causes of Action

The Reorganized Debtor shall retain all rights, claims, defenses, and causes of action, including but not limited to estate actions, and shall have sole authority to prosecute and/or settle such actions without approval of the Court under Bankruptcy Rule 9019 or otherwise.

The Reorganized Debtor shall reduce to cash any and all claims, causes of action and enforceable rights of the Debtor against third parties, or assertable by the Debtor on behalf of his creditors, his estate, or himself, whether brought in the Court or any other forum.

## K.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in Sections 1129(a) or (b) of the Bankruptcy Code.  These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and interest holder at least as much as the creditor or interest holder would receive in a chapter 7 liquidation case, unless the creditor or interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in Section 1129 of the Bankruptcy Code, and they are not the only requirements for confirmation.

### 1.    Who May Vote on or Object to the Plan

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Some parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or interest holder has a right to vote for or against the Plan only if that creditor or interest holder has a claim or interest that is both (1) allowed or allowed for voting purposes, and (2) impaired.

Generally, a claim or interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or interest, unless an objection has been filed to such proof of claim or interest.  When a claim or interest is not allowed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or

interest for voting purpose pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

A claim is considered impaired if the Plan alters the legal, equitable, or contractual rights of the claimholder.

The Debtor believes that Class 2 and Class 3 are allowed and impaired classes. The holders of claims and interests in these classes are therefore entitled to vote to accept or reject the Plan. Class 2 and Class 3 are impaired because their claims will not be paid in full on the Effective Date of the Plan.

The holders of Class 1 claims and holders in the Unclassified Classes are not entitled to vote to accept or reject the Plan.

A holder of a claim in more than one class is entitled to accept or reject the Plan in each capacity and will receive more than one ballot for each claim.

### 2. *Votes Necessary to Confirm the Plan*

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

A class of claims accepts the Plan if both of the following occur: (1) the holder of more than one-half ($1/2$) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds ($2/3$) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by Section 1129(b) of the Bankruptcy Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows a plan to bind nonaccepting classes of claims or interests if it meets all the requirements for consensual confirmation except the voting requirements of Section 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly", and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or interest, as the variations on this general rule are numerous and complex.***

### 3. *Liquidation Analysis*

To confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and interest holder would receive in a chapter 7 liquidation.

If the Debtor's case was a chapter 7 liquidation case, the Debtor's creditors would receive a lesser recovery than they are receiving under the Plan, as the Debtor's future employment income would not be part of the Debtor's estate and could not be used to fund recoveries.

Because the Plan provides the payment of the claims based upon future earnings and a chapter 7 plan would merely liquidate existing assets, no liquidation analysis is necessary. Notwithstanding the foregoing, if the case is converted to a case arising under Chapter 7 of the Bankruptcy Code, or the case is dismissed, the Debtor believes that creditors would receive substantially less than what is proposed under the Plan:

### Chapter 7 Liquidation

| | |
|---|---|
| Estimated Chapter 7 Administrative Costs | ($ 10,000) |
| Liquidation Value of Milstead Glass | $ 0 |
| Liquidation Value of TJ Interests | $ 2,273,533[7] |
| Less: Secured Debt | ($ 2,184,533) |
| Less: Closing Costs | ($ 89,000)[8] |
| Plus: Amount of Cash in Bank | $ 498,959 |
| **Net Amount Available to Creditors** | **$ 488,959** |

Amount payable to:
| | |
|---|---|
| Class 1: | $ 0[9] |
| Class 2: | $ 445,414[10] |
| Class 3: | $ 43,545[11] |

### Plan

In contrast, under the Plan, holders of claims in Class 2 will receive the Debtor's cash on hand (excluding cash and credit provided by M. Timothy Carey), and Class 3 holders will receive a *pro rata* share of the Debtor's continuing disposable income over the next five years (approx. $5,416 per month), as reflected below:

---

[7] The value of TJ Interests' real estate is assumed to be equal to the collateralized debt owed to Simmons Bank plus closing costs of $89,000.

[8] The costs to liquidate TJ Interests' real estate would likely exceed $89,000 due to broker fees, but the costs do exceed the net sales proceeds of the property for these illustrative purposes.

[9] This analysis assumes vehicle is retained by Linda Carey and the debt is reaffirmed.

[10] Figure based on ½ value of Milstead Glass (*i.e.*, $0) in a hypothetical chapter 7 liquidation, combined with ½ of the Debtor's cash. Amount may be reduced by claims asserted by administrative claimants, Class 1 claims, and contingent claims of Simmons Bank.

[11] Amount subject to reduction based on recoveries to Linda Carey in a hypothetical chapter 7 liquidation. Amount represents total of funds wrongfully converted by Linda Carey from Milstead Glass that would pass to Class 3 creditors in a liquidation and ½ of the Debtor's cash.

Income from Milstead Glass ($7,367 Monthly, Annualized):   $ 88,400
Income from TJ Interests  ($9,294 Monthly, Annualized):   $ 111,528

Estimated Total Plan Payments to Class 3(Paid Over 5 Years): $ 325,000
Plus: Amount of Cash in Bank to Linda Carey    $ 456,177[12]

Net Amount Available to Creditors (Over 5 Years)    $ 781,185
($5,416 Per Month for 5 Years, Plus Cash in Bank to Linda Carey)

Total Amounts Paid (Over 5 Years):
     Class 1 (2021 GMC Yukon):    $    0[13]
     Class 2: (Linda Carey–Priority)    $  456,177[14]
     Class 3: (General Unsecured)    $  325,000

As reflected above, recoveries to both Class 2 and Class 3 are improved through the chapter 11 process.  In particular, recoveries for the sole creditor in Class 2 are improved because Linda Carey stands to get all of the Debtor's cash on hand (less amounts stolen by Linda Carey from Milstead Glass), in addition to a Class 3 claim entitling her to a monthly payment over the course of five years that enhances her recovery relative to a fire-sale liquidation of Milstead Glass (which ultimately would likely have a value of zero due to significant liabilities).  Class 2 recovery is also directly improved as it does not diminish from administrative and Class 1 claims as it would in a liquidation.  Class 3's recovery also improves as they receive access to a *pro rata* share of the Debtor's disposable income over the period of five years far in excess of any value that would be allocated to such holders in a chapter 7 liquidation.  Moreover, all creditors receive more certainty that payments will be made in view of the cash and credit contributions of M. Timothy Carey in support of this Plan.  In all cases, creditors stand to do better than they would in a hypothetical chapter 7 liquidation.

    *4.    Feasibility of the Plan*

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation of assets or the need for further financial reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan.

There are two components to feasibility.  The first is that the Debtor must have the ability to initially fund the Plan, which is evident from the Debtor's income and the $500,000 cash and credit support of M. Timothy Carey.  Second, the Debtor must have the ability to make future Plan payments and operate without further reorganization.

---

[12] Cash in possession of Linda Carey reduced  by the amounts Linda Carey wrongfully converted from Milstead Glass ($37,519).  The $37,519 is reimbursed to Milstead Glass.

[13] Debt to be reaffirmed by Linda Carey.

[14] Cash in possession of Linda Carey reduced  by the amounts Linda Carey wrongfully converted from Milstead Glass ($37,519).  The $37,519 is reimbursed to Milstead Glass.

In this instance, the feasibility of the Debtor's Plan depends on his ability to continue generating income through Milstead Glass and TJ Interests, enhanced by the contribution by M. Timothy Carey.  The Debtor anticipates there being no issues with his ability to continue funding the Plan using employment and business income of Milstead Glass together with net cash flow from TJ Interests and the backstopped cash and credit of M. Timothy Carey in support of the Plan.

## L.      EFFECT OF CONFIRMATION OF THE PLAN

### 1.      *Discharge of the Debtor*

Confirmation of the Plan discharges the Debtor of any debt that arose before the date of confirmation, any claims arising from the rejection of an executory contract, any claims arising from the recovery of property and certain priority tax claims.

### 2.      *Binding Effect of Confirmation*

The confirmation of the Plan binds the Reorganized Debtor to the terms of the Plan including the provisions for the payment of the Plan debt.  Therefore, the Reorganized Debtor is legally obligated to fulfill the terms of the Plan and to pay the Plan debt.

The confirmation of the Plan also binds each of the Debtor's creditors even if its claim is impaired and it did not vote to accept the Plan.  Therefore, each creditor may not continue to treat its debt as being in default or pursue the collection of its debt other than as provided for in the Plan.

### 3.      *Final Decree*

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor, or such other party as the Court shall designate in the Plan confirmation order, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

## M.      RISK FACTORS

### 1.      *Failure of the Debtor to Perform Under the Plan*

The Debtor believes that the Debtor's Plan is not inherently more riskier that a non-bankruptcy work-out of these debts, because the value of the Debtor providing his continuing business income into a confirmed Plan over the span of several years would greatly outweighs the risk creditors take outside of bankruptcy, where Texas law prohibits garnishment of wages and recovery from a debtor's future earnings is far from certain. Through the chapter 11 process, the Debtor is motivated to continue working and making payments in accordance with this Plan.

2.      *Liquidation as an Alternative to the Proposed Plan*

The Debtor is proposing a Plan to repay a portion of his debts.  If the Plan is not approved by the creditors and confirmed by the Court, the Debtor's primary alternative is liquidation under chapter 7, or dismissal of the case.

Converting the case to liquidation under chapter 7 is unlikely to provide any advantage to the bankruptcy estate over the terms of the proposed Plan.  Because the Debtor is motivated to continue working to make plan payments, interposing a chapter 7 trustee would only serve to increase costs and prevent creditors from having access to the Debtor's ongoing employment funds, which are not part of a chapter 7 debtor's estate. Liquidation in accordance with chapter 7 clearly does not benefit Linda Carey, because administrative and secured claims, and a portion of the contingent claims of Simmons Bank, would be paid out of the Debtor's cash in the Vanguard Fund.  The Plan instead provides that the Vanguard Fund would be paid to Linda (less the amounts that she wrongfully withdrew from Milstead Glass).

3.      *Tax Consequences of the Plan*

The Debtor does not expect to incur any tax consequence as a result of the Plan that would be imputed to holders of claims.  A debtor may be subject to inclusion of any debt forgiveness as income, but this will not impact the tax liability of holders of claims.

Creditors and interest holders concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.

## N.      RETENTION OF JURISDICTION

1.      *Scope of Bankruptcy Court Jurisdiction*

The Court shall retain jurisdiction:

(a)      To hear and determine pending applications for the assumption or rejection of contracts and the allowance of claims resulting therefrom;

(b)      To hear and determine any and all adversary proceedings, applications, and contested matters, including any remands of appeals, and including any estate actions;

(c)      To ensure that distributions to holders of allowed claims are accomplished as provided herein;

(d)      To hear and determine any timely objections to or applications concerning claims or the allowance, classification, priority, estimation, or payment of any claim of interest, and to enter estimation orders;

(e)     To hear and determine all fee applications and fee claims; provided, however, that the Reorganized Debtor shall not be required to seek or obtain approval of the Court under Section 330 of the Bankruptcy Code or otherwise as to the allowance or payment of professional fees incurred after the Effective Date of the Plan;

(f)     To enter and implement such orders as may be appropriate in the event the order of confirmation is for any reason stayed, revoked, modified, reversed, or vacated;

(g)     To hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(h)     To enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder;

(i)     To consider any modification of the Plan pursuant to section 1127 of the Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Court, including, without limitation, the order of confirmation;

(j)     To enter and implement orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer and enforce injunctions provided for in the Plan and the order of confirmation;

(k)     To recover all assets of the Debtor and property of the estate, wherever located;

(l)     To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(m)     To hear and determine any other matter not inconsistent with the Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(n)     To enter a final decree closing the bankruptcy case, or to reopen the bankruptcy case in conformance with the Bankruptcy Code and the Plan, including without limitation to allow for recovery of estate actions.

2.     *Failure of Bankruptcy Court to Exercise Jurisdiction*

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any person or matter arising in, arising under, or related

to the bankruptcy case, the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such person or matter.

Dated: January 14, 2026.

Respectfully submitted,

/s/ Timothy John "TJ" Carey
Timothy John "TJ" Carey

Attorneys for the Debtor

**LEWIS BRISBOIS BISGAARD & SMITH**

 /s/ *Bennett G. Fisher*
Bennett G. Fisher
Texas Bar No. 07049125
bennett.fisher@lewisbrisbois.com
24 Greenway Plaza, Suite 1400
Houston, Texas 77046
(346) 241-4095 | Telephone
(713) 759-6830 | Fax
**COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Debtor-in-Possession's Plan of Reorganization and Disclosure Statement was served in accordance with Bankruptcy Rule 2014(a) upon the entities set forth below, by the manner indicated, on January 14, 2026.

Parties Requesting Notice:

Brendon D. Singh
**Tran Singh LLP**
2502 La Branch Street
Houston, Texas 77004
bsingh@ts-llp.com
*Counsel for Linda Carey*

**Jana Smith Whitworth**
Office of United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002
(713) 718-4650
Fax : (713) 718-4670
Email: jana.whitworth@usdoj.gov

/s/ *Bennett G. Fisher*
Bennett G. Fisher